Good morning, your honors. Marissa Conroy on behalf of Sharon Hatcher, the appellant in this matter. This is a case about a murder investigation, suspected gang members, and a detective trying to get through the front door of essentially every family member he could in the hopes of finding evidence of a crime. Now in this case, there are a number of related cases, and in the related case of United States v. Grant, this court held that that family member's search was without probable cause. I'd like to direct the jury... But there was a different affidavit with less information connecting the house to the investigation. Well, that is true. There were a number of the same facts reiterated in that affidavit. Then there were more in this one, or different. And there were different facts. But what I would like to focus the court to is this court ordered supplemental briefing regarding the application of Grant. And in Grant, the court discussed the connection between Devante, Ms. Hatcher's son, and the murder. And there are several erroneous facts in that opinion that would lead to the same conclusion here, that based on this affidavit presented, these searches were also without probable cause. One of the areas that I'd like to have you address is I think this affidavit, or this warrant, to go to at least an address that this defendant had, was six months after the alleged murder. Isn't that right? Absolutely. And I know in Grant's time, it was I think nine months, if I remember correctly. That's correct also. And there's some other factors that distinguish Grant from this and would, in my mind, require a different, a possible different result. I haven't made up my mind. But I was concerned, and I want you to tell me about the time issue and why six months just should have thrown the warrant or the application for the warrant out or whatever your position is. Well, essentially, under the facts presented in the warrant, Detective Thompson sought to search two residences. The first one was the Brett Street address. That would be the address listed on Devontae Hatcher's DMV records, as well as the address listed on the pawn receipt for the phone that he pawned. That all occurred at some point, the pawning in January of 2009, approximately three weeks after the murder occurred. Now, jump to April of 2009, and that's when Devontae is arrested on the unrelated assault. And when he's booked in, according to Detective Thompson's affidavit, he provides the Walnut Street address. That's Ms. Hatcher's residence. But I think what's telling is when you look at the way that that's written in the affidavit, Detective Thompson does not make the allegation that Devontae resides there. He's very careful with his language. And he simply states that Devontae provided an address of 729 Walnut Street. Well, but isn't that only because he can't know for sure whether the person actually resides where they say they do, but the fact that he says he does seems important for the issuance of a warrant, doesn't it? Well, it's conflicting, though. It's conflicting with the fact that the first residence sought to be searched is what he alleges is Devontae's address. And I think what's telling is when he's also asked his phone number at the time of booking, he provides the 1564 phone number, which is Ms. Hatcher's cell phone number. And also registered, the government points out, it's also registered to that Walnut Street address, correct? That's correct. That is the subscriber information for her cell phone, registered to that address. But it's her own personal cell phone. I think really what's most important here, though, is in the affidavit, there is not one single attempt to corroborate that he resides there. There are no allegations that he actually has been observed coming or going at any time. Well, let me ask you a more general question. If an affidavit says, I have a document that shows that John Doe gave this address as his address, do you need to corroborate that to have, if the person themselves wrote this address down as being theirs, do you have to corroborate that for it to be probable that they actually might do that? There was, I'm sorry, there was conflicting information. And I can't recall the case, I said it in my opening brief, but when a magistrate is presented with conflicting information, that raises the flag they should inquire for more information. I think also what's important here, though, is, like I said, because he was never observed coming or going from this address, there really is no plausible connection or any allegation in the affidavit of when this gun would have been taken to this address, maybe when it was removed from this address, how it could have feasibly stayed at that address, that six-month window the entire time. Did Detective Thompson really believe that in June of 2009, six months after this murder, that this particular weapon would be found at Ms. Hatcher's home? And I would submit, just like Grant, there was no showing on the face of the affidavit that the gun, even if it had been brought there, was still there in June of 2009. The government points out that, how do you pronounce his name? Devante. Devante, but Devante was in jail from April, so he wouldn't have had a chance to do anything with the gun, and so we're really only looking from January to April. Is that wrong? That seemed like another distinction that the government's trying to draw. I think based on the allegations that Detective Thompson makes in the affidavit, the way he makes it sound like gang members work together, I don't think, even if the gun had been at Ms. Hatcher's residence, I don't think Devante, in his mind, would have thought, well, I'll just pick up that murder weapon when I get out of jail in a year or two. No, most likely there would have been some other involved gang member moving that weapon out of the house. That's purely speculative, though, isn't it? Well, I think it makes sense. I mean, this Horton Grant commented, who would hang on to a murder weapon for nine months? Most people, when they have a murder weapon, they dispose of it as quickly as possible. But they also could hide it under the mattress at their mom's house and once hidden, they would have no incentive to bring it back to light. But also knowing that they did not know how long indefinitely they were going to remain in jail, someone needed to get that murder weapon out of there. So in Grant, the court didn't reach the staleness question until after examining whether James had any connection with the gun. And they said, in order to find a connection between James and the gun, you have to go through so many different inferences and speculations. And so the court made a point, no connection with the gun, and then said, even if there were a connection with the gun, would he have hung on to it for this amount of time? In this case, I think, in fact, Grant says there is a connection between Devante and the gun. There is enough evidence for that. So do we even get to the staleness point? Well, I kind of want to jump back just a moment to Grant because I think some of these facts that the court cites in Grant are in error and that really needs to be clarified. The statement in Grant at page 832, the court references calls made between his phone and the number associated with the SIM card. That is incorrect. That's in reference to the 1564 phone number. That is not Devante's cell phone. That is Ms. Hatcher's cell phone. There is nothing in the affidavit that indicates in any way, shape, or form that Devante used that phone or that he possessed that 1564 phone number. Wasn't that the number he gave when he was arrested? And that is his mother's cell phone, and that's confirmed in the affidavit when Detective Thompson states that that was the number Devante was calling from the jail to speak to his mother. Did he give that number when he was arrested as his mother's cell phone or don't we know? As his own phone number, according to Detective Thompson. So that fact in itself is erroneous. There is no connection between Devante and the 1564 number and the 4348 SIM. Although he says it's his number when he's arrested, correct? But in the very same affidavit, Detective Thompson confirms that is in fact Ms. Hatcher's cell phone number and Devante called the jail to that cell phone number. Is that not clear? Well, I was struggling to keep the three phone numbers apart. There was his 5886 or something number, and then there was a 1564 number, and then there was a 4848 or something SIM card to a different phone. But he claimed that the 1564 number was his own, and then he also had a cell phone that had a different number. And then there was the SIM card that belonged to yet another number that he called or that he used. So it isn't clear to me how these phone numbers are distinguished or whether it really makes a difference here or how that affects our analysis. I think it is important because I think that's how Detective Thompson is trying to somehow connect Devante and the connection to this murder to the Walnut Street address. And what I'm essentially saying is the 1564 number is not Devante's phone number, and there is no connection there between him using that particular phone. Now, there's the other phone, which is found on his property. That's the 5886 phone number, and that's where the picture of the gun was found. And I think what's important to note there is although this court in Grant refers to that as Devante's phone, we don't really know. The phone was found on his property, which is correct, at the time he was booked into jail. However, just like this court speculated in Grant about the three gang members that were also present at that time passing the gun around to get rid of it, that could have easily been someone else's phone, because Detective Thompson in his affidavit, despite numerous subpoenas for phone records and subscriber requests, he does not indicate who that phone belongs to or any information connected to that phone. Now, there is the picture of the gun on that phone. Again, we don't know if Devante took that photo. We don't know if it was his gun. And even assuming it was his gun, we don't know if it's the murder weapon. Most importantly, though, that 5886 number, there are no allegations on the face of the affidavit between that phone containing the picture of the gun and the 4348 number, which is the one that was connected to the actual murder victim's cell phone. Also importantly, there's no connection between the 5886 phone number and the Walnut Street address.  I do. Thank you very much, Your Honors. Good morning, Your Honors. May it please the Court, Carrie O'Neill on behalf of the United States. If I may, I think I would just like to correct that last factual assertion by Defense Counsel. I believe Detective Thompson set forth in his affidavit that when he reviewed the contacts and the 5886 number, that they did overlap with calls that had been made to and from the 4348 number, which is associated with the SIM card. So there is a nexus there in that the 1561 number and the 5886 number, which was booked into property, had both been calling the 4348 number or receiving calls. So they were calling that number, or they were calling numbers that that number had called? I was confused about that. I believe it's not entirely clear. I believe they were receiving calls or placing calls to that number and numbers that that 4348 had also placed calls to. It's not entirely clear. Let me ask you this question. You got two prongs. Either there was probable cause or there was a good faith search. Do you argue which position do you take, or do you take either position? The government believes that the affidavit here satisfies both the probable cause inquiry as well as the good faith reliance exception. Contrary to what Defense Counsel argues, the standard for probable cause doesn't require certainty of every fact that may exist or even a preponderance of the evidence. The reviewing courts look to the totality of the circumstances, including reasonable inferences. It's a common-sense, practical question. And as this court held in Pitts and Krupa, the magistrate's determination of probable cause will not be reversed, absent a finding of clear error. Now, the court in Graham already addressed a large part of the probable cause inquiry as it relates to defendant's son, Devante Hatcher. And I'll note that the district court here, the Honorable Judge Wu, who is also the district court judge in the Grant case, and it doesn't matter because your standard of review is de novo what he decided, but he did find probable cause here in Ms. Hatcher's case as opposed to the Grant case where he did not. And as this court in Grant said, undoubtedly the affidavit identifies a connection between Devante and the homicide, and it walks through all of the facts of the interconnecting phone numbers, the fact that he had pawned the Blackberry three weeks after the murder, his arrest at the end of April. So he was arrested on April 28th on an outstanding March warrant, which involved, I guess, that Devante had actually pointed a revolver at his cousin, and that revolver had not been found. And then on April 23rd, there's a picture on Devante's phone that matches the profile of the murder weapon. So here, there's the question of staleness, as Your Honor was asking, is much less severe as it was in Grant, because here we have this connection, this plausibility that the murder weapon is still around as late as April, the end of April of 2009. So the question really for this court is whether, given all these fair inferences on the record, which the government doesn't have to establish with certainty, was there probable cause to search the defendant's house? And in Grant, the court focused on the fact that the connections between both the younger Grant and the murder were entirely speculative, and also on the fact that the connection between Grant and his father's house was rather speculative as well, and at a certain point became stale. Here, Devante himself provided the link to the defendant's house, as has been discussed, by providing her address and phone numbers when booked at the end of April. Moreover, the evidence, the government would argue, suggests that he was using the 1564 number during a relevant time period. As is set forth in the affidavit, there's overlap between the calls being made among all three of these phones. Thus, the magistrate did not clearly err in finding a reasonable inference that Devante, upon offering his mother's address when booked, may have been residing at or storing possessions at his mother's house. That's not an illogical conclusion from the facts as presented in the affidavit. And defense counsel points out that there's a lack of surveillance or corroboration that he, in fact, lived there or resided there, and that's true, but that, in essence, is explained by the timeline of the investigation, and perhaps this goes to the good faith argument. But there, it was not until after Devante was incarcerated on the April arrest that the officer learned, first of all, of the 1564 number, the phone calls it made to the 4348 number. It wasn't until after that that he discovered the photo on the 5886 phones. It wasn't until after Devante was incarcerated that these links came up, thereby making it difficult to corroborate Devante's own assertion that a defendant's address was, I don't want to say was his address, but simply what he provided when booked. Moreover, the staleness inquiry in Grant, as Your Honor suggested, sort of came after the court walked through sort of the very attenuated and, at the end of the day, speculative connections between Grant and the murder. Here, there's a much tighter nexus between Devante and the murder, and then we have the phone with the image of a gun matching the profile of the murder weapon as late as April 23, 2009. So as I stated before, it's not an unreasonable inference for the magistrate to draw that this is still a weapon that hasn't been tossed. I'll point out that in Grant, one of the factors that the court focused on was that around April of 2009, they had seen Grant actually toss a weapon into the bushes, making it unlikely that perhaps that suspect would hold onto other weapons. But here, we don't have that fact. In fact, we have a picture on the phone as late as April 23, and I'll note that at GER 17, Detective Thompson set forth in his affidavit, based on his experience, which is detailed at GER 4, that it is common for gang members to hide their firearms or weapons at their home or at a safe house, including the house of a family member, friend, or girlfriend or spouse. And this was an experienced officer set forth in his statement about his personal experience at GER 4. So here, and again, the staleness inquiry is not a mere mathematical question of how many months or weeks may have elapsed, but we look at the totality of the circumstances, the nature of the criminal activity. And here, all of that shows, both in regard to DeMonte's connection to the house and also the staleness inquiry, that the magistrate's inferences were not improper. And even if this court disagrees with the magistrate and finds that somehow he clearly erred, given the totality of the circumstances, the government strongly believes that the defendant cannot meet the high threshold to deny application of Leon Good Faith. In order to meet that threshold, the defendant has to shift the affidavit, fails to establish at least a colorable argument for probable cause, and is on its face so lacking in indicia of probable cause as to render official belief in his existence entirely unreasonable. The government does not believe that that threshold has been met here in this case. The facts of Grant are simply different, and each case must be examined on its own facts. The defendant also has an argument about nighttime service. Her argument overlooks two main principles, however, which is that under California Penal Code 1533, the magistrate should actually look to the safety of the peace officers when serving a warrant and the safety of the public. And as United States v. Rodriguez states, yes, there must be some particularized factual basis. It's set forth in the affidavit here, demonstrating the propensity for both Grant and his cohorts for violence. But I believe it's clear from this court's case law and also from California case law, if the search was otherwise constitutionally reasonable and there was no violation of the Fourth Amendment, suppression is simply not a remedy. These two cases weren't cited by the government in its brief, but both Hudson v. Michigan at 547 U.S. 586 and United States v. Hector, a Ninth Circuit case at 474 F. 3rd, 1150, stand for that proposition. Counsel, if those are not cited in the papers, would you please leave those citations with the deputy clerk after the argument? I will. Yes, Your Honor. I'll just move on to the second search as well, which the defendant is challenging. The search warrant affidavit there is identical to the first with the exception of the detailing of the June 13th phone call between Devante and Sonji Duncan, which is at GER 40-41. And it also details the list of items recovered on June 12th. As a district court here held, the magistrate, again, did not clearly err in determining based on that call that there could have been an additional weapon belonging to Devante at his mother's house. Clearly, there are passages in the phone call where they are referencing the existence of another gun other than the Tec-9 firearm that was found, and then expressing the sentiment that it was a good thing that the closet hadn't been hacked by the officers serving the warrant. Moreover, after the June 12th search, it became apparent that there was indicia of Devante either living at his mother's house or storing possessions there. There were three pieces of mail addressed to Devante, papers of gang affiliation, and the like, thereby further corroborating, supporting the inference based on that phone call that there might have been additional items belonging to Devante there. Would the court like me to address Defendant's additional arguments about Special Agent Hamilton's testimony? You don't need to if you don't want to. We don't deem any argument in the briefs to be waived if it's not discussed early. Okay, thank you, Your Honor. I'll just briefly point out, as to Special Agent Hamilton's testimony, to make it clear that his testimony about the location of the ammunition manufacturers was based not only on phone calls he had made and review of websites, but based on his personal visits, his personal knowledge, and visits to these manufacturing sites, and that's at GER 135 and 109. Counsel, by experience, sometimes when you raise issues that haven't been argued by your opponent, you sometimes get yourself in big trouble. I've seen victory disappear from the jaws of whatever, but you can go and argue any way you want, but that's pretty good. Well, I will take your cue, Your Honor, and I will submit at this point unless the court has any further questions. I don't believe that we do. Okay, thank you. Ms. Conroy, you have some rebuttal time remaining. First, to clarify back to the 5886 phone number, there were no phone calls alleged to be made in the affidavit between the 5886 phone number and the 4348 phone number. Instead, what was discovered when scrolling through the 5886 phone number, there were similarities in contact numbers, but there were no allegations of calls between this SIM card associated with the murder victim's cell phone and the 5886 number, which had the photo of the gun contained on it. Your Honors, even assuming there is a connection between Devante and the possible murder weapon, I do believe that ultimately the problem in this case is where is the connection between the murder weapon, and a fair probability that it would be found in Ms. Hatcher's home on June 29th. That is the problem. And just like Grant, the face of the affidavit simply does not demonstrate that in June, six months after the murder, that that weapon would still be found in Ms. Hatcher's home. And unless there are any other questions, I would submit. Thank you, counsel. The case just argued is submitted. Both of the arguments were very helpful, and we appreciate the efforts of counsel.
judges: Bright, Graber, Ikuta